RECORD NO. 22-4525

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## MATTHEW RYAN HUNT,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

---

### BRIEF OF APPELLANT

---

Stephen J. van Stempvoort
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1765

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

INDEX OF AUTHORITIES......................................................................... iii

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES....................................................................2

INTRODUCTION ........................................................................................3

STATEMENT OF THE CASE.......................................................................4

    A.    Hunt is arrested after officers arrive at his apartment and find firearms. ......................................................................4

    B.    Hunt is indicted of an offense under 18 U.S.C. § 922(g)(1) and pleads guilty without a written plea agreement............................6

    C.    Despite the Government's objection, the presentence report declines to assess a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). ...................................................6

    D.    The trial court sustains the Government's objection and assesses a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). ...................................................8

SUMMARY OF THE ARGUMENT ...............................................................10

ARGUMENT .............................................................................................11

I.    Standard of Review....................................................................11

II.    18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as-applied to Hunt.....................................................11

    A.    This Court's review is de novo. .........................................11

    B.    For a firearm restriction to comply with the Second Amendment, the Government must affirmatively prove that there was an analogous firearm restriction in the founding era.........................................................14

i

C.    Section 922(g)(1) facially violates the Second Amendment because there is no founding-era analog that required felons to be permanently and categorically disarmed. ..........................................................................17

D.    Section 922(g)(1) violates the Second Amendment as applied to Hunt because there is no founding-era analog under which all thieves were permanently disarmed. ........................22

III.   The district court erred in rejecting the probation officer's assessment and applying a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). .....................................................................25

A.    The Government failed to prove that Hunt fired the firearm. ...............................................................................25

B.    Hunt should be resentenced without the enhancement. ......................30

CONCLUSION ......................................................................................30

STATEMENT REGARDING ORAL ARGUMENT ...........................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# INDEX OF AUTHORITIES

Page(s)

**Cases**

*Class v. United States,*
    138 S. Ct. 798 (2018)...............................................................11, 12, 13

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................................16, 21, 22

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ..................................................*passim*

*Menna v. New York,*
    423 U.S. 61 (1975).....................................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022)............................................................*passim*

*Range v. Att'y Gen. United States,*
    53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion*
    *vacated*, 56 F.4th 992 (3d Cir. 2023)........................................18, 20

*Taylor v. United States,*
    495 U.S. 575 (1990)..................................................................23, 24

*United States v. Allen,*
    446 F.3d 522 (4th Cir. 2006) .....................................................11

*United States v. Askew,*
    193 F.3d 1181 (11th Cir. 1999) .................................................26, 29

*United States v. Blount,*
    337 F.3d 404 (4th Cir. 2003) .....................................................25

*United States v. Bolden,*
    964 F.3d 283 (4th Cir. 2020) .....................................................28

*United States v. Brown,*
    854 F. App'x 535 (4th Cir. 2021) ..............................................27

*United States v. Carrington*,
    700 F. App'x 224 (4th Cir. 2017) ....................................................26

*United States v. Charles*,
    No. MO:22-CR-00154-DC, 2022 WL 4913900
    (W.D. Tex. Oct. 3, 2022) ...................................................17

*United States v. Collins*,
    982 F.3d 236 (4th Cir. 2020) .......................................................11, 14

*United States v. Coombes*,
    No. 22-CR-00189-GKF, 2022 WL 4367056
    (N.D. Okla. Sept. 21, 2022) ...............................................23

*United States v. Douglas*,
    885 F.3d 145 (3d Cir. 2018) ...................................................30

*United States v. England*,
    555 F.3d 616 (7th Cir. 2009) .................................................30

*United States v. Flanagan*,
    No. 21-2972, 2022 WL 10887448 (7th Cir. Oct. 19, 2022) ..............30

*United States v. Flores-Alvarado*,
    779 F.3d 250 (4th Cir. 2015) ...............................................26

*United States v. Gibbs*,
    26 F.4th 760 (7th Cir. 2022) ........................................................28, 30

*United States v. Goins*,
    No. 5:22-CR-00091, 2022 WL 17836677
    (E.D. Ky. Dec. 21, 2022) .....................................................21

*United States v. Gosnell*,
    39 F. App'x 847 (4th Cir. 2002) .........................................27

*United States v. Haught*,
    387 F. App'x 327 (4th Cir. 2010) .........................................30

*United States v. Holden*,
    No. 3:22-CR-30, 2022 WL 17103509
    (N.D. Ind. Oct. 31, 2022) ....................................................21

*United States v. Lozano*,
   962 F.3d 773 (4th Cir. 2020) ...................................................................13

*United States v. Olano*,
   507 U.S. 725 (1993)....................................................................................12

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...................................................................17

*United States v. Stitt*,
   139 S. Ct. 399 (2018)................................................................................24

*United States v. Walker*,
   29 F.3d 908 (4th Cir. 1994) .....................................................................26

**Statutes**

18 U.S.C. § 922(g)(1)..........................................................................*passim*

18 U.S.C. § 3231 ...........................................................................................1

28 U.S.C. § 1291 ...........................................................................................1

U.S.S.G. § 2K2.1(b)(1)(A) ..........................................................................6

U.S.S.G. § 2K2.1(b)(5) ..............................................................................29

U.S.S.G. § 2K2.1(b)(6)(B)..................................................................*passim*

W. Va. Code § 61-3-11 ...............................................................................24

W. Va. Code § 61-3-12 ...........................................................................6, 24

W. Va. Code § 61-7-12 ...........................................................................7, 27

**Other Authorities**

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
  32 Harv. J.L. & Pub. Pol'y 695 (2009)................................................................17

Fed. R. Crim. P. 11(a)(2) ................................................................................12, 13

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
  Dangerous Persons from Possessing Arms*,
  20 Wyo. L. Rev. 249 (2020) ................................................................19, 20, 21

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231. Matthew Ryan Hunt timely filed a notice of appeal, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES**

I.    Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment, either

facially or as applied to the appellant, Matthew Hunt.

II.   Whether the trial court erred in applying a 4-point enhancement under

U.S.S.G. § 2K2.1(b)(6)(B) where the presentence report determined that

there was an insufficient factual basis to apply the enhancement and the

Government failed to present evidence at the sentencing hearing to fill in

the factual gaps left by the presentence report.

## **INTRODUCTION**

For a firearm restriction to comply with the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Government must affirmatively prove that an analogous gun restriction existed in the founding era, when the Second Amendment was adopted. The founding generation does not appear to have permanently disarmed citizens who were convicted of felonies. Because there is no sufficiently specific analogous statute indicating that someone convicted of a felony would be disarmed for life, 18 U.S.C. § 922(g)(1) facially violates the Second Amendment. And even if the statute is not facially unconstitutional, it nevertheless violates the Second Amendment as applied to the appellant, Matthew Hunt, because there is no evidence that the founding-era generation permanently disarmed individuals like him who were convicted of breaking and entering into a non-dwelling.

The district court also erred in determining—contrary to the presentence report's recommendation—to apply a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). The Government failed to present evidence at the sentencing hearing to fill in the factual gaps left by the presentence report, and it therefore failed to carry its burden of proving that the enhancement applied. The trial court's judgment should be reversed.

## STATEMENT OF THE CASE

**A.     Hunt is arrested after officers arrive at his apartment and find firearms.**

On September 9, 2021, officers from the Parkersburg, West Virginia police department responded to a report of a potential altercation between a man and a woman in an apartment in which Matthew Hunt resided. (JA105). When officers arrived at the apartment, a neighbor informed them that she had heard gunshots from inside the apartment a few minutes before they arrived. (JA105).

Although the door to the apartment was locked, the officers looked inside and saw a woman—Sandra Green—slumped over, unconscious. (JA106). The officers forced entry into the apartment and soon located Hunt on a bed in the bedroom. (JA106). Hunt, too, was unconscious. (JA106). The officers suspected that both Hunt and Green were under the influence of opiates. (JA106). Lying near Hunt on the bed was a Smith & Wesson 9-millimeter pistol. (JA106).

After searching the apartment, the officers discovered a spent 9-millimeter bullet casing on the entryway floor, another spent 9-millimeter casing on the bedroom floor next to the closet, an unspent 9-millimeter bullet on the floor of the dining room, a plastic bag containing spent rounds in a storage container in the bathroom, and three other firearms and ammunition in a safe in the bedroom closet. (JA107).

After Green regained consciousness, the officers asked her if a gun had been fired inside the apartment. (JA106). Green told them that she may have fired the gun while trying to unjam it. (JA106). Gunshot residue testing later determined that Green had residue on her consistent with gunshot residue. (JA109; JA111). After she was confronted with the results of the gun residue test in early November 2021 (approximately two months after the relevant events occurred), Green stated that she did not shoot the firearm and that she and Hunt had been exploding Tannerite (an explosive firearm target) that day or the day before the officers arrived. (JA109).

Officers also interviewed Hunt. (JA108). Hunt advised them that he did not fire a weapon inside the residence and indicated that he may have given the 9-millimeter pistol to Green, who could have fired it. (JA108). Like Green, a gunshot residue test performed on Hunt returned positive for gunshot residue. (JA111).

During their search of the apartment, officers attempted to trace the trajectory of the bullets that had allegedly been fired, even using a drywall saw to cut away the plaster in an attempt to locate the bullet or bullet fragments. (JA108). The officers, however, were unable to find any discharged bullet in the apartment. (JA108).

Several subsequent phone calls that Hunt made from jail were recorded, but they shed little light on the matter, either. (JA109-JA110). In fact, in one phone call that Hunt made to the neighbor who had reported the gunshots to the officers, Hunt asked, "Why didn't you come running to save me?" (JA109).

**B.      Hunt is indicted of an offense under 18 U.S.C. § 922(g)(1) and pleads guilty without a written plea agreement.**

Hunt was subsequently indicted of being a felon in possession of the four firearms found in the apartment, in violation of 18 U.S.C. § 922(g)(1). (JA8-JA9). The indictment specified Hunt's predicate felony as an August 15, 2017 conviction for West Virginia breaking and entering under W. Va. Code § 61-3-12. (JA9).

Hunt ultimately pleaded guilty to the single-count indictment without a written plea agreement. (JA38; JA14). As the factual basis for the plea, Hunt admitted that, "on September 9th I was in my apartment and I had access to a safe that had guns in it and I, I was caught with them." (JA18). He also stated that he knew that he had previously been convicted of West Virginia breaking and entering on August 15, 2017. (JA18-JA19). The government's proffer of evidence did not state that Hunt fired a weapon in the apartment, and Hunt never admitted to doing so. (JA20-JA22).

**C.      Despite the Government's objection, the presentence report declines to assess a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B).**

The presentence report ("PSR") prepared in this case assessed Hunt a base offense level of 14 under U.S. Sentencing Guidelines ("U.S.S.G.") § 2K2.1. (JA112). Because four firearms were found in the apartment, the PSR added a 2-point enhancement under U.S.S.G. § 2K2.1(b)(1)(A). (JA112).

The PSR also considered whether to apply an additional enhancement under U.S.S.G. § 2K2.1(b)(6)(B). That provision of the Guidelines provides for an additional 4-point enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." *Id*.

The Government contended that the 4-point enhancement should apply. (JA135). According to the Government, Hunt possessed the Smith & Wesson 9-millimeter pistol in connection with West Virginia wanton endangerment with a firearm, in violation of W. Va. Code § 61-7-12. (JA135-JA137). The probation officer, however, rejected the Government's argument and refused to apply the enhancement. (JA137). As the probation officer noted, there were conflicting statements about the relevant events, including the identity of who fired the firearm. (JA137). Hunt himself could not recall what happened in the apartment; Green initially claimed to have fired the weapon; gunshot residue was found on both Hunt and Green; no other witness saw who fired the gun; and law enforcement officers were unable to find the bullets that were allegedly discharged in the apartment. (JA137).

The probation officer noted that the enhancement potentially could be appropriate if the Government introduced additional evidence at the sentencing hearing to demonstrate that Hunt fired the weapon ("e.g., including testimony from

the only apparent witness, Sandra Green") but that, absent such evidence, the enhancement should not apply. (JA137).

Having rejected the Government's position as to U.S.S.G. § 2K2.1(b)(6)(B), the PSR applied a total offense level of 13 (after the 3-point reduction for acceptance of responsibility) and a criminal history category of VI, for an advisory Guidelines sentencing range of 33 to 41 months. (JA113-JA114, JA123, JA129).

### D. The trial court sustains the Government's objection and assesses a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B).

The Government stated in its sentencing memorandum that it intended to present testimony from Sandra Green at the sentencing hearing to support the 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). (JA40). At the hearing itself, however, the Government declined to present any additional evidence regarding the applicability of the enhancement. (JA50). As the Government admitted, Green had been subpoenaed to testify, but she "disavows any knowledge of who fired a firearm in the apartment on the date in question or if a firearm was discharged in the apartment on the date in question." (JA50). The Government therefore did not present any witness testimony at the sentencing hearing.

Instead, the Government argued that, based on the information contained in the PSR, it was more likely than not that Hunt discharged a firearm in the apartment and thereby committed West Virginia wanton endangerment. (JA51-56). As counsel for Hunt observed, however, both Hunt and Green tested positive for gunshot

8

residue, and both Hunt and Green were unconscious when officers entered the apartment. (JA45). It was equally likely that Green—not Hunt—had fired the weapon after using drugs and that Hunt had taken it away from her. (JA57). Green herself initially stated that she may have fired the weapon while trying to unjam it. (JA106).

The district court sustained the Government's objection and determined to apply the enhancement under U.S.S.G. § 2K2.1(b)(6)(B). (JA59). Even though no witness testified at the sentencing hearing, the district court found that the gun had been found near Hunt, that one of Hunt's jail calls seemed to assume that he had fired a weapon, and that Green suggested in her November 2021 statement that Hunt had fired the gun. (JA60). The district court recognized that Green's November 2021 statement "could be perceived to be inconsistent with her initial statement in which she indicates that she may have fired the gun" but nevertheless reasoned that Green "did not indicate on that occasion that the defendant had not [fired the weapon]." (JA60).

The additional 4-point enhancement boosted Hunt's total offense level to 17. (JA64). Combined with his criminal history category of VI, Hunt's total offense level resulted in an advisory Guidelines range of 51 to 63 months' imprisonment. (JA64).

After hearing allocution and the arguments of counsel, the district court imposed a sentence of 60 months' imprisonment, followed by three years of supervised release. (JA83; JA95). Hunt timely filed this appeal. (JA102).

## SUMMARY OF THE ARGUMENT

*Bruen* holds that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

The Government has not identified any laws at the founding that are closely analogous to the felon-in-possession provisions in § 922(g)(1). The historical record reveals that founding-era governments generally would disarm (real or perceived) ideological enemies of the state. But there appears to have been no founding-era practice of disarming citizens merely because that individual was convicted of a mine-run felony. Because there is no sufficiently specific analogous statute indicating that someone convicted of a felony would be disarmed for life, 18 U.S.C. § 922(g)(1) facially violates the Second Amendment. And even if the statute is not facially unconstitutional, it nevertheless violates the Second Amendment as applied to Hunt, because there is no evidence that the founding-era generation permanently disarmed individuals like Hunt, who was convicted of breaking and entering into a non-dwelling.

The district court also erred in rejecting the probation officer's recommendation not to apply the 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). As the probation officer correctly noted, the facts recited in the PSR were at best in equipoise over whether Hunt fired a weapon, not to mention where it was fired. To fill in the factual gaps left by the PSR, the Government needed to present additional evidence at the sentencing hearing. Because it failed to do so, the Government failed to carry its burden. The enhancement does not apply.

## **ARGUMENT**

### I.     **Standard of Review**

Whether a statute of conviction complies with the Second Amendment is a question of law that is reviewed de novo. *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020).

When reviewing the district court's application of the Sentencing Guidelines, this Court reviews factual findings for clear error and legal conclusions de novo. *United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006).

### II.    **18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as-applied to Hunt.**

#### A.     **This Court's review is de novo.**

Hunt's guilty plea does not preclude his ability to challenge the constitutionality of the statute of conviction. *Class v. United States*, 138 S. Ct. 798, 803 (2018). With respect to Second Amendment arguments, specifically, a

defendant may enter an unconditional plea of guilty and nevertheless still challenge the statute of conviction on Second Amendment grounds on appeal. *Id*. at 805–06.

Hunt did not assert a Second Amendment argument in the district court, but that does not change the standard of review, either. Ordinarily, the failure to assert an argument in the district court operates as a forfeiture of that argument on appeal. *See United States v. Olano*, 507 U.S. 725, 733 (1993). But *Class* held that a defendant who pleads guilty—even without entering a conditional plea—does not waive the right to bring a Second Amendment claim. *Class*, 138 S. Ct. at 805. *See also Olano*, 507 U.S. at 733 (explaining the difference between forfeiture and waiver).

If an unconditional guilty plea does not waive the ability to assert a Second Amendment argument on appeal, then a defendant who has entered such a plea should not be deemed to have forfeited the argument, either. After all, a conditional plea is a preservation tool, through which the defendant may preserve the ability to assert certain arguments on appeal. *See* Fed. R. Crim. P. 11(a)(2). By entering into an unconditional guilty plea, a defendant affirmatively determines not to preserve arguments for appeal. It would be unusual for a defendant who inadvertently missed a Second Amendment claim to be put in a worse position than a defendant who enters into an unconditional plea and thereby affirmatively rejects the very tool that is available to him for preserving error for appeal. That may be why, in *Class*, the

Court rejected the Government's argument that "a defendant who pleads guilty *cannot* challenge his conviction on appeal on a forfeitable or waivable ground that he either failed to present to the district court or failed to reserve in writing." *Class*, 138 S. Ct. at 806.

The same principles that motivated the decision in *Class* militate against finding forfeiture here. Where a Second Amendment claim "challenge[s] the Government's power to criminalize [his] (admitted) conduct" and "call[s] into question the Government's power to 'constitutionally prosecute' him," the argument should not be deemed forfeited on appeal, just as it is not waived on appeal even when the defendant has rejected the very tool at his disposal that would allow him to preserve it. *Class*, 138 S. Ct. at 805. A claim is not waived where it asserts that the prosecution "may not convict petitioner no matter how validly his factual guilt is established." *Menna v. New York*, 423 U.S. 61, 63 (1975). Under those circumstances, forfeiture should not apply, either. *See also United States v. Lozano*, 962 F.3d 773, 779 (4th Cir. 2020) (noting that the rule applied in *Class* applies when defendants "challenge[] the government's power to prosecute *in the first instance*").

*Class* allows a defendant to assert a Second Amendment claim on appeal even after entering into an unconditional plea—that is, without preserving the Second Amendment claim for appeal. *See* Fed. R. Crim. P. 11(a)(2); *Class*, 138 S. Ct. at 805. It would be anomalous to hold that a far more strict standard of review should apply

to a defendant who has likewise failed to preserve the Second Amendment claim, but did so by inadvertently failing to assert it. Either way, the defendant failed to preserve the argument. The same rule should apply in both circumstances. Hunt's claim should be reviewed de novo. *Collins*, 982 F.3d at 243.

**B.   For a firearm restriction to comply with the Second Amendment, the Government must affirmatively prove that there was an analogous firearm restriction in the founding era.**

*Bruen* recalibrated the Second Amendment analysis, rejecting the two-part analysis that this Court (and many others) had previously adopted. Instead, under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*., 142 S. Ct. at 2126. The plain text covers Hunt's conduct here; namely, the right of "the people"[1] to "keep and bear Arms." U.S. Const., amend. 2.

Because the Second Amendment presumptively prohibits prosecution of Hunt for possessing a firearm, the Government must demonstrate that Hunt was convicted

---

[1] The Government has sometimes argued in similar cases that felons are not part of "the people" who have rights under the Second Amendment, such that defendants like Hunt fail the *Bruen* analysis right at the outset. But it would be exceedingly odd to interpret felons (not to mention groups like the mentally disabled) as falling outside "the people" who are protected by the Constitution, particularly when the First Amendment protects the right of "the people" peaceably to assemble and the Fourth Amendment enshrines the right of "the people" against unreasonable searches and seizures. Adopting the Government's position would require this Court to find that the Amendments use the same phrase—"the people"—in different ways. *See also Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting).

for conduct that falls outside the right enshrined in the Second Amendment; that is, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Only if a firearm regulation is consistent with American historical tradition may a court conclude that "the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*.

The upshot of *Bruen* is that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. It is possible for the Government to do so through analogical reasoning. Doing so "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id*. at 2131.

But on the other hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 2133 (cleaned up).

*Bruen* pointed to an example of analogical reasoning that would support the Government's assertion that particular conduct fell outside the ambit of the Second Amendment:

> Consider, for example, *Heller*'s[2] discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Id.* at 2133 (internal citations omitted).

*Bruen*'s discussion of how the "sensitive places" doctrine may be analogically supported is instructive for the felon-in-possession context. For the Government to win the day with respect to the constitutionality of 18 U.S.C. § 922(g)(1), the Government must identify groups of individuals who were categorically prohibited in the founding era from possessing firearms based on their commission of a felony-analogous crime.

---

2 *District of Columbia v. Heller*, 554 U.S. 570 (2008).

### C.     Section 922(g)(1) facially violates the Second Amendment because there is no founding-era analog that required felons to be permanently and categorically disarmed.

With respect to § 922(g)(1), the Government cannot carry its burden. "The historical evidence is inconclusive at best" on whether felons were excluded from the right to bear arms during the era of the Founders. *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting).

If anything, history indicates that "founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). "After scouring the colonies' existing legislative records from 1607 to 1815, one historian could not find 'a single instance in which [the 14 colonies] exercised a police power to prohibit gun ownership by members of the body politic.'" *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *4 (W.D. Tex. Oct. 3, 2022). "Only four state constitutions had what might be considered Second Amendment analogues in 1791—Massachusetts, North Carolina, Pennsylvania, and Vermont—and none of these provisions excluded persons convicted of a crime." *Skoien*, 614 F.3d at 648–49 (Sykes, J., dissenting). *See also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 712 (2009) ("For relevant authority before World War I for disabling felons from *keeping* firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution.").

At best, the Government can point only to instances in which ideological enemies of the state were prevented from owning firearms, due to the state's concern that they may revolt against the civil authority. For example, after the English Civil War, Charles II "disarmed nonconformist (i.e., non-Anglican) Protestants." *Range v. Att'y Gen. United States*, 53 F.4th 262, 274 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). After the Glorious Revolution, the English Parliament enacted a restriction in 1689 "forbidding Catholics who refused to take an oath renouncing their faith from owning firearms, except as necessary for self-defense." *Id.* at 275. As *Range* observed, "the . . . likely historical reason for disarming this entire group" was its "perceived disrespect for and disobedience to the Crown and English law." *Id*. After all, individuals burdened by the restriction could evade it by pledging ideological conformity: "When individuals swore that they rejected the tenets of Catholicism, their right to own weapons was restored." *Id*.

During the colonial era, it appears that at least a few groups of religious dissenters—*i.e.*, individuals deemed to be ideologically at odds with the state—were disarmed on that basis. *See id*. at 276–77. Given the recurrent religious and civil wars at that time in history, these acts of disarmament appear to have been directed largely at disarming potential political insurrectionists, not ordinary criminals. And during the Revolutionary War, some of the nascent states' legislatures disarmed citizens who—during the war—did not swear loyalty oaths to the cause of the

Revolution. *Id*. at 278–79. Again, because these restrictions were promulgated in the middle of an active rebellion against Britain, they appear to have been targeted at eliminating the ability of the state's ideological enemies to gather into an armed force that could threaten the new-birthed state governments, not at preventing commonplace criminals from possessing firearms. It appears, in other words, that these firearms restrictions were intended to prevent armed counter-revolution, not to promote the states' ordinary police interest in a law-abiding citizenry. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them.").

Although some have argued that the founding-era restrictions demonstrate that people who are generally "dangerous" fall outside the scope of the Second Amendment, that argument is insufficiently specific. The disarmament statutes upon which the argument relies are firearms restrictions that appear to have been imposed against individuals who could potentially overthrow the state: rebels and ideological enemies, not commonplace thieves. "[S]tripping rebels of their gun rights followed well-established practice in both England and the colonies," but that practice is far removed from permanently disarming people who committed other types of crimes, particularly commonplace ones. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). In

fact, it appears that even the "dangerous" groups of rebels were not permanently disarmed: "[P]rohibited persons in the founding era—including armed insurrectionists—regained their rights [to possess firearms] once they no longer posed a violent threat." Greenlee, 20 Wyo. L. Rev. at 269.

Thus, the analysis employed in cases like *Range* is not as granular as *Bruen* demands. In *Range*, the panel opinion ruled that *Bruen*'s analogical test was satisfied because there were various historical restrictions that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. But the notion that some people (who seem largely to have been political dissenters) were deemed "untrustworthy" of hewing to the social compact says nothing about whether, as a historical matter, criminals were categorically disarmed, much less whether commonplace thieves were categorically—and permanently—disarmed.

The analysis in cases like *Range* is zoomed out to such a broad level of generality that it is unhelpful in answering the question that *Bruen* asks. The relevant question is whether conviction of a theft offense was expected—at the time of the founding—to result in the categorical disarmament of an American citizen for life. There is little—if anything—in the historical record to suggest that it was. Even though founding-era felons were deprived of other rights (such as voting and serving on juries), "we see no explicit criminal, or even more general virtue-based,

20

exclusions from the right to bear arms like we do in other contexts." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting). That absence—as *Bruen* held—means that the founding era likely did not view felon status as falling outside the scope of the Second Amendment. *Bruen*, 142 S. Ct. at 2131.

The Government may contend that the Second Amendment allows disarmament of any citizen who is deemed insufficiently virtuous. But that argument assumes that the Second Amendment is a civic right. *Kanter*, 919 F.3d at 463–64 (Barrett, J., dissenting). *Heller*—which established that the Second Amendment is an individual right—precludes that argument, because there is "no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights." *Id*. at 463. *See also United States v. Goins*, No. 5:22-CR-00091, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022); Greenlee, 20 Wyo. L. Rev. at 284–85.

To the extent that the Government relies upon historical surety laws, which were adopted by several states "in the mid-19th century" and which "prohibited a person from carrying a weapon if there was reasonable cause to believe that person posed a risk of injury or breach of the peace," that analogy fails, too. *United States v. Holden*, No. 3:22-CR-30, 2022 WL 17103509, at *4 (N.D. Ind. Oct. 31, 2022). After all, the restriction imposed by surety laws "was surmountable: the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond." *Id*. Section 922(g)(1), by contrast, is permanent and absolute.

Finally, the Government may rely upon *Heller*'s statement that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. But most courts have recognized that this dicta did not decide the constitutionality of all felon-in-possession laws, which *Heller* did not address. *See, e.g.*, *Kanter*, 919 F.3d at 445. And *Bruen*, for its part, specifically explained how historical regulations may provide support for the portion of *Heller*'s dicta pertaining to firearms prohibitions in "sensitive places." *Bruen*, 142 S. Ct. at 2133. The corollary is that, for felon-in-possession statutes to be constitutional, they, too, must be supported by the historical record. Because there is no such historical support here, § 922(g)(1) does not comply with the Second Amendment.

**D.    Section 922(g)(1) violates the Second Amendment as applied to Hunt because there is no founding-era analog under which all thieves were permanently disarmed.**

In the event that § 922(g)(1) is not facially unconstitutional, it nevertheless is unconstitutional as applied to Hunt. Again, *Bruen* holds that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Theft has been a general societal problem since the existence of private property, and the potential that someone who was previously convicted of breaking and entering could possess a firearm no doubt existed in Revolution-era America. *See United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *10–11 (N.D. Okla. Sept. 21, 2022). Yet, as noted above, there is no evidence that the founding generation believed it necessary to address that problem by permanently and categorically disarming everyone who had been previously convicted of a theft offense.

And even if the Government argues that founding-era felons convicted of burglary were subject to potential capital punishment, those strict punishments appear to have applied (if at all) primarily to felons convicted of offenses under the common law. *See Kanter*, 919 F.3d at 458–59 (Barrett, J., dissenting).

Hunt was not convicted of traditional common-law burglary. Under the common law, burglary was defined as "the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." *Taylor v. United States*, 495 U.S. 575, 580 & n.3 (1990) (citing W. LaFave & A. Scott, Substantive Criminal Law § 8.13, p. 464 (1986) (LaFave & Scott) and 4 W. Blackstone, Commentaries *224). Hunt, by contrast, was convicted under a West Virginia breaking and entering statute that specifically excludes entry into a dwelling. (JA9). The relevant statute prohibits breaking and entering with felonious

23

intent into a variety of buildings "other than a dwelling house or outhouse adjoining thereto or occupied therewith," as well as "any railroad or traction car" and "any steamboat or other boat or vessel." W. Va. Code § 61-3-12. West Virginia criminalizes breaking and entering into a dwelling (*i.e.*, traditional "burglary") under a different statute, W. Va. Code § 61-3-11.

Because Hunt's conviction was not for an offense that amounts to felonious "burglary" as it existed under the common law, it is not useful to analogize to punishments that were meted out to founding-era felons who were convicted of burglary under the common law. Even if the founding generation believed that common law burglars did not fall within the scope of the Second Amendment, Hunt is not a common law burglar. And there is every reason to believe that those who were convicted of merely breaking and entering into boats, vehicles, or commercial buildings instead of dwellings would not be subject to permanent disarmament.[3]

At the very least, it is the Government's burden to demonstrate otherwise. Absent identification of such a prohibition, the Government cannot carry its burden

---

[3] In fact, Hunt's offense of conviction is not even categorically violent, because the statute criminalizes entry into the sorts of nontypical vehicles that *Taylor* explained were outside the scope of generic burglary. *See Taylor*, 495 U.S. at 599; *United States v. Stitt*, 139 S. Ct. 399, 407 (2018) (explaining that, in *Taylor*, "the statute used the word 'any'; it referred to ordinary boats and vessels often at sea (and railroad cars often filled with cargo, not people), nowhere restricting its coverage, as here, to vehicles or structures customarily used or adapted for overnight accommodation").

of showing that the Second Amendment—as ratified by the people in the 18th century—recognized the government's ability to permanently prohibit anyone from possessing a firearm simply for being convicted of breaking and entering into a non-dwelling. *Bruen*, 142 S. Ct. at 2127. And, of course, the question is not whether the founding generation adopted a version of the Second Amendment that may represent the policy choices that contemporary Americans may choose if the decision were ours to make now; the question is what version of the Second Amendment the founding generation adopted at the time that they adopted it. *Id*. at 2127.

Because there is no "affirmative[]" proof that the founding generation approved of a lifetime ban on firearm possession for individuals in Hunt's circumstances, § 922(g)(1) cannot constitutionally be applied to Hunt on the basis of his felony conviction. *Bruen*, 142 S. Ct. at 2127.

## III. The district court erred in rejecting the probation officer's assessment and applying a 4-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B).

The district court also erred in finding that—contrary to the presentence report's recommendation—the Government carried its burden of proving that the 4-point enhancement under U.S.S.G § 2K2.1(b)(6)(B) applies.

### A. The Government failed to prove that Hunt fired the firearm.

The Government must prove sentencing enhancements by a preponderance of the evidence. *United States v. Blount*, 337 F.3d 404, 411 (4th Cir. 2003). Although this is not a particularly exacting standard of proof, "[i]t is not, however, a toothless

standard either, and a district court may not abdicate its responsibility to ensure that the prosecution meets this standard before adding months or years onto a defendant's prison sentence." *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999). Instead, "[i]t is the district court's duty to ensure that the Government carries this burden by establishing a sufficient and reliable basis for its request for an enhancement." *Id*.

Often, the district court simply relies upon the presentence report in order to establish facts pertinent to sentencing. *See, e.g.*, *United States v. Walker*, 29 F.3d 908, 911 (4th Cir. 1994). But if the facts that are recited in the presentence report are insufficient to support an enhancement, then the district court must look elsewhere for the requisite evidentiary basis. *United States v. Flores-Alvarado*, 779 F.3d 250, 256 (4th Cir. 2015); *United States v. Carrington*, 700 F. App'x 224, 233 (4th Cir. 2017).

Here, the district court could not rely upon the PSR alone to support the enhancement under U.S.S.G. § 2K2.1(b)(6)(B). After all, the PSR recommended not that the enhancement be applied but instead recommended the opposite: that it not be applied. (JA137).

That recommendation is not surprising. To demonstrate that the enhancement applies, the Government is required to "first prove that the defendant possessed the gun, and then prove that the gun was connected to another felony offense." *United*

26

*States v. Gosnell*, 39 F. App'x 847, 848–49 (4th Cir. 2002). Here, the "other felony offense" is the West Virginia offense of wanton endangerment, which requires proof that the defendant "wantonly perform[ed] any act with a firearm which creates a substantial risk of death or serious bodily injury to another." W. Va. Code § 61-7-12; *see United States v. Brown*, 854 F. App'x 535, 536 (4th Cir. 2021).

But as the PSR pointed out in response to the Government's objection, there was insufficient evidence to demonstrate that Hunt discharged a firearm. (JA137). Both Hunt and Green tested positive for gunshot residue; Green and Hunt had no memory of the weapon being fired; Green's prior statements indicated both that she may have fired the weapon and that Hunt may have fired the weapon; no one could find the bullets that had allegedly been discharged; spent casings were in several locations in the home; and no one was able to trace the bullets' trajectory to determine the location from which they could have been fired. (JA137).

Even assuming that a firearm was fired, there was no evidence regarding where it was fired or whether it was pointing at or near anyone when it was fired. No witness saw what happened, and neither Hunt nor Green could remember what happened. In fact, in one phone call that Hunt made to the neighbor who had reported the gunshots to the officers, Hunt asked, "Why didn't you come running to save me?" (JA109). The mere fact that the firearm was found in the same bedroom as

27

Hunt is not enough to establish that the sentencing enhancement applies. *See United States v. Bolden*, 964 F.3d 283, 288 (4th Cir. 2020).

As the PSR observed, if the Government had provided testimonial evidence at the sentencing hearing to resolve the impasse ("including testimony from the only apparent witness, Sandra Green"), then its case may have been able to clear the evidentiary hurdle. (JA137). The Government, however, failed to produce any such testimonial evidence. Green never testified. The district court was therefore left with the facts as recited in the PSR. Those facts, as the probation officer recognized, fail to show by a preponderance that Hunt fired a weapon. (JA137).

The situation here is not dissimilar to what happened in *United States v. Gibbs*, 26 F.4th 760, 766 (7th Cir. 2022). There, the presentence report lacked sufficient facts to support that the defendant's uncharged conduct involved 4.5 kilograms or more of methamphetamine. *Id*. at 766. At the sentencing hearing, counsel for the Government failed to call any witnesses to support the uncharged drug quantity. *Id*. Because the Government failed to call any witnesses to add facts beyond those that were contained in the presentence report, "the district court did not have any evidence backing up the AUSA's eleventh-hour representations about what the evidence would show, and so nothing was available to resolve the dispute about drug quantity." *Id*. Without witness testimony to fill in the gaps left by the presentence

report, "the government failed to meet its burden to prove the uncharged conduct by a preponderance of the evidence." *Id*.

*Askew* is also instructive. There, the district court imposed a 4-level enhancement under U.S.S.G. § 2K2.1(b)(5), which applies if the defendant transferred firearms with reason to believe that they would be used in another felony. *Askew*, 193 F.3d at 1183. The presentence report and the witness testimony provided by the Government at the sentencing hearing, however, established only that the defendant "stole a lot of guns, which could be used for a variety of purposes, and that [the defendant] knew the guns were going to be sold." *Id*. at 1185. As the Court noted, it was possible that the defendant knew that the guns would be used in another felony, but it was equally possible that he had no such knowledge:

> The Government's evidence yielded several permissible inferences. One is that Askew had reason to believe that the guns would be used to commit a felony; another is that Askew had reason to believe the guns would be sold to pawn shops, hunters, or ordinary law-abiding citizens. Askew may also have had no idea of the purpose for which the guns would eventually be used. Nothing in the record before the sentencing judge eliminated these "innocent" possibilities. The evidence, therefore, was in equipoise. Accordingly, the Government failed to meet the burden of proof necessary to enhance Askew's base offense level under section 2K2.1(b)(5). Because the Government failed to meet its burden of proof, the district court's finding that Askew had reason to believe the guns would be used in another felony was clearly erroneous.

*Id*.

The same is true here. As the probation officer indicated, the facts in the PSR could not eliminate the "innocent" possibility that Green fired the weapon—or even that no weapon was fired, at all. (JA137). And where, as here, "the evidence [is] in equipoise," the preponderance-of-the-evidence standard is not met. *United States v. Haught*, 387 F. App'x 327, 329 (4th Cir. 2010). *See also United States v. Douglas*, 885 F.3d 145, 153 (3d Cir. 2018); *United States v. England*, 555 F.3d 616, 623 (7th Cir. 2009); *cf. United States v. Flanagan*, No. 21-2972, 2022 WL 10887448, at *3 (7th Cir. Oct. 19, 2022) (where the evidence "supported a finding that 'could go another way'" and was in equipoise, the government failed to carry its burden of proof by a preponderance of the evidence).

## B.    Hunt should be resentenced without the enhancement.

In the event that Hunt's conviction is not constitutionally infirm, his sentence should be vacated and the case remanded for resentencing without the enhancement. *See Gibbs*, 26 F.4th at 767 ("The government is entitled to only one chance to present this evidence [supporting a sentencing enhancement].").

## <u>CONCLUSION</u>

The district court's judgment should be reversed or, in the alternative, vacated and remanded for resentencing.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Matthew Hunt requests oral argument in this appeal. The Second Amendment argument appears to be an issue of first impression in this Circuit. This Court would benefit from oral argument to ensure that the parties' respective positions can be fully presented and explored.

<div style="margin-left: 40%;">

Respectfully submitted,

</div>

Dated: January 23, 2023

<div style="margin-left: 40%;">

/s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Appellant*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,825*] words.

[   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 23, 2023</u>        <u>/s/ Stephen J. van Stempvoort</u>
                                     *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 23rd day of January, 2023, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Jeremy B. Wolfe
> OFFICE OF THE U.S. ATTORNEY
> 300 Virginia Street East, Suite 4000
> Charleston, West Virginia  25301
> (304) 345-2337
>
> *Counsel for Appellee*

I further certify that on this 23rd day of January, 2023, I caused a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

> /s/ Stephen J. van Stempvoort
> *Counsel for Appellant*